# Illinois Official Reports

## Appellate Court

---

***Destiny Health, Inc. v. Connecticut General Life Insurance Co.,***
**2015 IL App (1st) 142530**

---

| | |
|---|---|
| Appellate Court Caption | DESTINY HEALTH, INC., Plaintiff-Appellant, v. CONNECTICUT GENERAL LIFE INSURANCE COMPANY and CIGNA CORPORATION, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-2530 |
| Filed | August 21, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-4138; the Hon. Raymond Mitchell, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Paul K. Vickrey, Arthur A. Gasey, and Laura A. Kenneally, all of Niro, Haller & Niro, of Chicago, for appellant.<br><br>Raja Gaddipati and Joseph A. Roselius, both of DLA Piper LLP, of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Hall and Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1    The plaintiff, Destiny Health, Inc. (Destiny), filed suit against the defendants, Connecticut General Life Insurance Company and Cigna Corporation (collectively referred to as Cigna), alleging violations of the Illinois Trade Secrets Act (Trade Secrets Act) (765 ILCS 1065/1 *et seq.* (West 2008)) and breach of a confidentiality agreement. The circuit court granted Cigna's motion for summary judgment, finding no genuine issue of material fact on the issue of whether Cigna used any of Destiny's trade secrets or breached the confidentiality agreement. Destiny appeals, arguing the court erred by failing to: (1) construe the evidence in Destiny's favor; (2) consider circumstantial evidence; and (3) apply the inevitable disclosure doctrine. For the reasons which follow, we affirm the judgment of the circuit court.

¶ 2    The following factual recitation is taken from the pleadings, affidavits and depositions of record.

¶ 3    Destiny, a wholly owned subsidiary of Discovery Holdings (a South African company), is in the business of developing products for the health insurance industry. Among other things, it pioneered Vitality, a wellness-based healthcare program designed to make people healthier by balancing and integrating health insurance coverage with incentives that motivate active participation in healthcare and reward healthy behavior. Wellness programs such as Vitality have become increasingly popular among employers who offer such programs to their employees as a means to improve the overall health of their workforce and reduce healthcare and insurance costs. Under Vitality, an employee earns points for engaging in certain healthy activities (*e.g.*, getting a flu shot) and may redeem those points for rewards (*e.g.*, monetary contributions to a health savings account).

¶ 4    Cigna provides a suite of products and services, including health insurance, to employers and organizations around the world. Prior to the events at issue here, Cigna offered health and wellness programs to employers interested in providing such a program as a benefit to their employees.

¶ 5    In 2007, Cigna became interested in combining its existing wellness program with a points-based program, using a third-party vendor. Richard Gray, an executive at Cigna, and Art Carlos, president and chief actuarial officer at Destiny, discussed the possibility of entering into a business relationship enabling Cigna to offer a points-based wellness program to its employer-clients. In order to evaluate the potential relationship, Cigna required sensitive business information from Destiny. In July 2007, the parties executed an amendment to an existing confidentiality agreement governing the exchange of business information during the parties' negotiations.

¶ 6    The preamble to the confidentiality agreement stated that "the parties wish to enter into discussions regarding the possible formation of a working relationship *** which will require the disclosure of certain highly confidential information and material nonpublic information by one party *** to the other party." Section 2 of the confidentiality agreement prohibited the parties from "using or misappropriating" any confidential information. Section 4 required the parties to return any confidential information and work product upon termination of the relationship. Section 6 states that the agreement does not apply to information that "is in or hereafter enters the public domain." The agreement does not commit Cigna to entering into a relationship with Destiny, prohibit Cigna from developing its own points-based program, or prevent Cigna from contracting with another vendor.

¶ 7        In September 2007, following execution of the amendment to the confidentiality agreement, Cigna sent several representatives to Destiny's office in Chicago for a full-day meeting. Elizabeth Horgan, product director at Cigna, testified that the purpose of the meeting was to gather information and conduct a "deep dive" evaluation of Destiny's Vitality program. Horgan served as project manager and leader of the deep-dive team. Destiny furnished Cigna with all of the information it requested, including proof of concept, return on investment, information technology, and actuarial data. Destiny provided Cigna with historical data and actuarial studies from South Africa showing that the Vitality program is successful and profitable. Destiny also provided Cigna with specific information regarding how it determined which activities to incentivize, the number of points to award for completing each activity, and how it determined when an award was due. In his deposition, Carlos testified that Cigna's "deep dive" evaluation provided a level of insight into the Vitality program that well surpassed anything that Destiny had previously shared with an outside organization. Indeed, Horgan and Gray acknowledged that Destiny gave them all of the information that they requested.

¶ 8        In October 2007, after evaluating Destiny's Vitality program, Gray informed Carlos that Cigna could not move forward with the project due to "system challenges." According to Gray, Cigna withdrew from negotiations because: Destiny's Vitality program was inflexible and too rigid to fit Cigna's needs; Destiny's claimed return on investment for Vitality was not supported by its underlying data; Destiny was not a proven provider in the United States; Destiny refused to consider a vendor relationship rather than a joint venture; Destiny's financial results with prior joint ventures in similar situations were poor; Destiny had high management turnover; and the cost of the Vitality program was too high.

¶ 9        In her deposition, Horgan testified that Cigna believed a flexible wellness program was better than a "fixed" program. That is, Cigna wanted to give each employer the ability to customize its own program by choosing the activities to incentivize, the point values for each activity, the rewards offered, and the point levels to earn specific rewards. Lisa Suter, a senior product specialist at Cigna, stated in her affidavit that "[t]he optimal incentive program depends upon employer goals, culture, wellness philosophy, demographics, health improvement programs offered and base participation rates." The Vitality program, on the other hand, offered a fixed approach and did not allow any customization. As Carlos explained in his deposition, Vitality is based on actuarial studies and uses a unique formula of programs, activities, and point levels to yield specific responses and savings. Since the Vitality program is based on actuarial science, Destiny believed that customization would lead to different (and potentially worse) results. As such, employers are not permitted to change the variables.

¶ 10       After negotiations with Destiny ended, Cigna explored the possibility of partnering with other vendors, including: IncentOne, Virgin Life Care, Carlson Marketing, Tangerine Wellness, and Incentive Logic. Cigna ultimately selected IncentOne as its vendor.

¶ 11       Scott Young, director of business development at IncentOne, was responsible for developing and designing Cigna's incentive-points program. Beginning in March 2008, Cigna and IncentOne worked together on the project. Young testified in his deposition that Cigna had a list of activities it wanted to incentivize and IncentOne provided Cigna with recommended milestones, guidelines, and incentive point values based upon IncentOne's experience and data. Young explained that IncentOne contracted with Health Scan Solutions, a health services researcher, to conduct a full literature review of publicly available information. Young stated that IncentOne provided the research findings to Cigna.

¶ 12 Young also testified that IncentOne developed a return on investment (ROI) predictor and a proprietary budget calculator. He explained that the budget calculator is a tool that employers can use to demonstrate how adjustments to point levels impacted the level of employee engagement, program costs, and anticipated savings. IncentOne also developed Empower, a proprietary methodology which helped determine the point values to award for each activity. Cigna used this information to set default activities, point levels, and rewards. The default settings served as a template and employers could change the settings. Young testified that Cigna accepted nearly all of IncentOne's design recommendations.

¶ 13 Although Cigna had a list of activities it wanted to incentivize, Young testified that there was nothing unique about those activities as Cigna had already included those activities in its preexisting wellness program or they were known in the industry. According to Young, nothing from the Vitality program was used to develop the IncentOne-Cigna Program, and Cigna personnel never mentioned the name Vitality, never shared information about Vitality, and never provided documents referencing Vitality. Young stated that he was not even aware that Cigna had previously considered a business arrangement with Destiny.

¶ 14 A number of Cigna's employees were deposed and corroborated Young's testimony. They testified that: Cigna and IncentOne worked together to build a points-based wellness program; Cigna had a list of activities it wanted to incentivize; Cigna relied upon its own experience and market research; IncentOne provided Cigna with guidelines and recommendations; and Cigna did not share any information with IncentOne regarding the Vitality program. In addition, Horgan testified that some members of the deep-dive team also worked with IncentOne to develop Cigna's wellness program.

¶ 15 In January 2009, Cigna announced the launch of its wellness-based incentive health insurance program, known as the "Cigna Incentive Points Program," which Destiny alleged incorporated many of its proprietary trade secrets, without its consent. Destiny concluded that Cigna never intended to enter into a business relationship with it, and that Cigna's participation in their negotiations was simply a ruse to view its confidential information.

¶ 16 In April 2009, Destiny filed a complaint in the circuit court of Cook County against Connecticut General Life Insurance Company alleging misappropriation of trade secrets (765 ILCS 1065/1 *et seq.* (West 2008)). Thereafter, Destiny filed a second amended complaint adding Cigna Corporation as a defendant and adding a claim for breach of contract. In its second amended complaint, Destiny identified five broad categories of trade secrets: actuarial data, information technology, operations, disease management, and marketing. Destiny alleged that its confidential information constitutes trade secrets under the Trade Secrets Act and that it has exercised reasonable efforts to maintain the secrecy and confidentiality of its information. It further alleged that this information is not generally known by its competitors and, if known, would be an economic benefit to them. According to the second amended complaint, Cigna knew that Destiny's confidential information constituted trade secrets and it misappropriated those secrets by having members of the deep-dive team develop Cigna's incentive-points program. Destiny sought injunctive relief, as well as compensatory damages.

¶ 17 In April 2014, Cigna moved for summary judgment, arguing that Destiny failed to raise a genuine issue of material fact as to whether Cigna violated the Trade Secrets Act or breached the confidentiality agreement. Cigna maintained that the confidential information provided to it during negotiations does not qualify as trade secrets because the specific details of the Vitality program are publicly available. More specifically, Cigna claimed that Destiny

provided information about Vitality, on a nonconfidential basis, to prospective customers and gave presentations at trade shows. Cigna also argued that, even if the confidential information qualifies as a trade secret, the undisputed facts show it did not use or misappropriate Destiny's trade secrets. Last, Cigna asserted that Destiny cannot prove damages. Cigna supported its motion with deposition testimony, affidavits, and documents produced in the discovery phase of litigation.

¶ 18  In opposing the motion, Destiny argued that a question of fact was created based upon undisputed evidence that Cigna acquired Destiny's actuarial data (*e.g.*, "proof of concept" and ROI) and it improperly used that data by developing its own points-based wellness program. Destiny also argued that disclosure of its trade secrets was "inevitable" because the same employees who conducted the "deep dive" evaluation of Vitality were also tasked with designing and developing Cigna's wellness program. Moreover, Destiny disputed Cigna's claim that it disclosed its trade secrets to the public. Destiny claimed that the level of information it provided to Cigna was never provided to another entity. Finally, Destiny relied on its expert, Joseph Gemini, to dispute Cigna's claim that Destiny suffered no damages.

¶ 19  In July 2014, the circuit court granted Cigna's motion for summary judgment on Destiny's trade-secrets and breach-of-confidentiality agreement claims, concluding that Destiny failed to present any evidence that Cigna used Destiny's confidential information. This appeal followed.

¶ 20  As this matter comes to us on appeal from the entry of summary judgment, our review is *de novo*, applying the same legal standards as did the circuit court. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15. Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012); *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). In determining whether a genuine issue of material fact exists, we construe the pleadings, depositions, admissions, and affidavits strictly against the movant and in a light most favorable to the opponent (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), drawing all reasonable inferences in favor of the nonmovant (*Lapidot v. Memorial Medical Center*, 144 Ill. App. 3d 141, 147 (1986)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. Mere speculation and conjecture is insufficient to defeat a motion for summary judgment. *Benson v. Stafford*, 407 Ill. App. 3d 902, 912 (2010). "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Williams*, 228 Ill. 2d at 417.

¶ 21  We initially address Destiny's argument that the circuit court failed to construe the evidentiary material strictly against Cigna as the movant and in the light most favorable to it as the opponent of the motion. Destiny maintains the court erred when it relied on Young's deposition testimony to conclude that "IncentOne provided Cigna with *** proof of concept." Destiny claims that the court ignored a document that was prepared during Cigna's preliminary review of IncentOne, which states that IncentOne's "proof of concept [is a] work in progress." Destiny argues the document presents a factual dispute as to whether IncentOne provided Cigna with "proof of concept." Destiny also argues the court erred by failing to "consider the issue of Mr. Young's credibility" and "clear bias."

¶ 22  In ruling on a motion for summary judgment, the circuit court does not decide a question of fact but, rather, determines whether one exists. *Coole v. Central Area Recycling*, 384 Ill. App.

3d 390, 396 (2008). Thus, a court cannot make credibility determinations or weigh evidence in deciding a summary judgment motion. *Id.* Accordingly, Young's credibility is not an issue. The question is whether there is evidence in the record contradicting his testimony.

¶ 23 As to Destiny's contention that the circuit court failed to construe the evidence in Destiny's favor by ignoring evidence, we reiterate, our review is *de novo* (see *Williams*, 228 Ill. 2d at 417), and, therefore, we examine the depositions and pleadings anew to determine whether a genuine issue of fact exists. No deference is given to the circuit court's ruling. *Interior Crafts, Inc. v. Leparski*, 366 Ill. App. 3d 1148, 1151 (2006).

¶ 24 Based on our review of the record, we find no factual dispute between the contents of Cigna's preliminary report, which was created in 2007, and Young's testimony, which related to the work he performed on the Cigna-IncentOne project in March 2008. Young's unrebutted testimony demonstrates that IncentOne contracted with Health Scan Solutions to conduct research and that IncentOne provided the research findings, including proof of concept, to Cigna. Although Young did not specify when the studies were conducted or when IncentOne gave its proof-of-concept findings to Cigna, the absence of such evidence does not create a factual dispute. *Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 710-11 (1994) (a plaintiff must present some affirmative evidence to defeat a motion for summary judgment). Destiny presented no evidence to rebut Young's testimony that it was IncentOne that provided Cigna with proof-of-concept findings.

¶ 25 In urging reversal of the circuit court's judgment, Destiny's principal argument is that a genuine issue of fact exists on the question of whether Cigna used its trade secrets in the development of Cigna's incentive-points program. Based on the following analysis, we reject the argument.

¶ 26 The Trade Secrets Act provides for injunctive relief as well as actual and punitive damages for the misappropriation of trade secrets. 765 ILCS 1065/3, 4 (West 2008). In order to establish improper use of trade secrets, a plaintiff must show: "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 281 (2005).

¶ 27 As a preliminary matter, we note that Destiny fails to identify, with any degree of particularity, the alleged trade secrets or confidential information that Cigna is alleged to have used in the development of its incentive-points program. See *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (noting it is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated). However, as we agree with Cigna that Destiny has presented no evidence to establish the second essential element, misappropriation, we assume for purposes of our analysis (without deciding) that the confidential information conveyed to Cigna qualifies as trade secrets.

¶ 28 Under the Trade Secrets Act, misappropriation can be shown in one of three ways: by improper acquisition, unauthorized disclosure, or unauthorized use. 765 ILCS 1065/2(b) (West 2008); *Liebert*, 357 Ill. App. 3d at 281. To satisfy the use requirement, Destiny must show that Cigna could not have created its incentive-points program without the use of Destiny's trade secrets. *Mangren Research & Development Corp. v. National Chemical Co.*, 87 F.3d 937, 944 (7th Cir. 1996).

¶ 29    In this case, Cigna offered, as direct evidence, the deposition testimony of Young, Horgan, and Berger, each of whom stated that Cigna and IncentOne worked together, over the course of many months, to design and develop Cigna's incentive-points program. They testified that IncentOne conducted its own market research and provided guidance to Cigna, and that IncentOne made a number of recommendations to Cigna, many of which were accepted. They denied relying on any information obtained from the Vitality program.

¶ 30    Cigna also supported its motion for summary judgment with the deposition testimony of Carlos who was repeatedly asked how Cigna used Destiny's trade secrets. In response to these questions, Carlos testified that he is "reaching a reasonable conclusion" based upon the fact that Cigna was interested in Destiny's confidential information and later developed a program similar to Vitality. Ian Duncan, Destiny's expert witness, admitted in his deposition that he could not identify any specific Destiny information that Cigna used to develop its incentive-points program. Duncan testified that he does not know how Cigna chose the point values, the activities to incentivize, the relative weights of the point values, the rewards Cigna offers, or the number of points required to earn each reward. When asked whether there was any evidence that Cigna actually used any of Destiny's trade secrets, Duncan consistently answered, "I don't know" or "I can't point to anything."

¶ 31    Although Destiny presented no direct evidence of Cigna's improper use of its confidential information, it contends that the following circumstantial evidence is sufficient to support an inference that Cigna misappropriated its trade secrets and thus create a genuine issue of fact on the issue: (1) Horgan had no experience with incentive-points programs prior to evaluating Destiny's program; (2) Cigna was impressed with the Vitality program and noted "it is light years away from anything else on the market"; (3) Cigna's decision not to partner with Destiny was based on price; (4) Cigna was under pressure to get an incentive-points program to the market; (5) by partnering with IncentOne, Cigna knew it would have to be involved in the design and development of the program; and (6) there is no evidence that Cigna destroyed Destiny's confidential information as required by the confidentiality agreement. Destiny also asks this court to infer misappropriation based upon the fact that Cigna had access to its trade secrets and developed an incentive-points program similar to the Vitality program.

¶ 32    Destiny is correct in arguing that circumstantial evidence can satisfy a plaintiff's burden to prove trade secret misappropriation. See *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 923 (N.D. Ill. 2002) (since direct evidence of misappropriation of trade secrets is typically not available, a plaintiff can rely on circumstantial evidence). However, as Cigna correctly argues, "[s]ufficient circumstantial evidence of use in trade-secret cases must demonstrate that (1) the misappropriating party had access to the secret and (2) the secret and the defendant's design share similar features." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005). Assuming for the purposes of analysis that the information relating to the Vitality program that Destiny revealed to Cigna constituted trade secrets, the first element, access, is satisfied. Therefore, the focus of our analysis is on the second element, the similarity of Cigna's incentive-points program and the Vitality program.

¶ 33    Destiny asserts that its expert witness, Duncan, "pointed to similarities between Destiny's trade secrets and Cigna's incentive-points program." For example, Duncan testified that Cigna viewed Destiny's historical data and actuarial studies, which demonstrated "the link between incentives, behavior change and reduction in *** hospital admission rates, and upon the basis of that, that enabled [Cigna] to go ahead and make the decision to launch a program of this

nature." Duncan also testified that the studies showed the importance of managing chronic illness such as hypertension and the importance of fitness and exercise. Destiny asserts that its historical data and actuarial findings "made their way into Cigna's program" and "provided a footprint for Cigna to work from in creating its own [wellness] program."

¶ 34     Surely, however, Destiny cannot mean to argue that the importance of managing chronic illness or the concept of a points-based wellness program are themselves trade secrets. See *Composite Marine Propellers*, 962 F.2d at 1266 (stating that the idea of making marine propellers and selling them in the boating industry is not a trade secret). Contrary to Destiny's assertion, Duncan did not identify any similarities between Cigna's incentive-points program and Destiny's Vitality program. Rather, Duncan simply discussed the confidential information that Cigna "viewed" or "had access to," as well as what that information "showed" or "illustrated." Duncan admitted in his deposition that he never conducted a side-by-side comparison between Cigna's incentive-points program and the Vitality program and that he could not identify any specific Destiny information that Cigna used in the development of its incentive-points program.

¶ 35     The evidence of record established that Destiny's Vitality program incentivizes certain specific healthy activities by offering points to participants which can be redeemed for rewards. An employer offering the Vitality program cannot change the activities incentivized or the points awarded for each activity. It is a fixed program. In contrast, Cigna's program allows each participant employer to customize its program by selecting the activities it chooses to incentivize and setting the point values for each activity. As Cigna argues, the two programs are both philosophically and operationally different. Other than the fact that both programs are incentive-points programs, Destiny produced no evidence, direct or circumstantial, that the programs are similar.

¶ 36     Alternatively, Destiny argues it established a genuine issue of fact on the question of Cigna's use of its trade secrets under the inevitable disclosure doctrine. More specifically, Destiny asserts that "because Horgan and her Cigna team acquired specialized knowledge regarding the details of [Vitality], and then were subsequently assigned to work on the same task of developing an [incentive-points program] for Cigna *** disclosure of Destiny's trade secrets was inevitable." In support of its argument, Destiny cites *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), and *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054 (2000) (*Strata*).

¶ 37     In *PepsiCo*, a high-level product manager had access to sensitive information about PepsiCo's costs, pricing and marketing strategies. The manager resigned to take a position with one of PepsiCo's competitors, and he was made directly responsible for managing products that competed with the PepsiCo products he managed in his prior job. Since it was undisputed that the manager possessed important trade secrets that would be directly relevant to his new employment, the district court determined that the manager would inevitably use PepsiCo's trade secrets in his new position and granted a preliminary injunction prohibiting the new employment. The United States Court of Appeals for the Seventh Circuit affirmed, holding that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo*, 54 F.3d at 1269.

¶ 38     In *Strata*, a sales representative had access to confidential information about Strata's business plans, product development, formulas, customer lists, and sales and marketing

methods. The sales representative resigned and took a position as a sales representative at MRP, one of Strata's competitors. Strata filed a complaint alleging that the sales representative could not operate or function without relying on its trade secrets and sought a preliminary injunction prohibiting the sales representative from beginning employment at MRP. The trial court dismissed Strata's complaint and denied its motion for a preliminary injunction. On appeal, this court reversed and, relying on *PepsiCo*, held that inevitable disclosure is a theory upon which a plaintiff can proceed under the Trade Secrets Act. *Strata*, 317 Ill. App. 3d at 1070.

¶ 39    Cigna responds by arguing that *PepsiCo* and *Strata* are distinguishable because they involve employees leaving one company to work for a competitor. Cigna cites *Omnitech International, Inc. v. Clorox Co.*, 11 F.3d 1316 (5th Cir. 1994) (*Omnitech*), and argues that the inevitable disclosure doctrine should not apply in trade secret cases arising out of failed commercial transactions.

¶ 40    In *Omnitech*, the plaintiff and Clorox signed a nondisclosure agreement and a letter of intent in connection with the possible sale of Omnitech's "Dr. X" line of roach spray. Omnitech agreed to share certain proprietary information with Clorox while keeping Clorox's interest in the insecticide market confidential. Clorox was given the right to conduct laboratory and marketing tests of Dr. X and was granted the right of first refusal to purchase Omnitech's assets. Clorox later acquired another line of insecticides from a different manufacturer and decided not to go forward with the Dr. X acquisition. Omnitech filed suit alleging trade secret misappropriation. Omnitech sought to rely not on direct evidence, but rather on an inference of misappropriation from the fact that Clorox had access to its proprietary information. On appeal, the United States Court of Appeals for the Fifth Circuit held that such evidence was insufficient as a matter of law to support an inference that Clorox improperly disclosed or used any of Omnitech's confidential information. The court explained:

> "Certainly 'misappropriation' of a trade secret means more than simply using knowledge gained through a variety of experiences, including analyses of possible target companies, to evaluate a potential purchase. To hold otherwise would lead to one of two unacceptable results: (i) every time a company entered into preliminary negotiations for a possible purchase of another company's assets in which the acquiring company was given limited access to the target's trade secrets, the acquiring party would effectively be precluded from evaluating other potential targets; or (ii) the acquiring company would, as a practical matter, be forced to make a purchase decision without the benefit of examination of the target company's most important assets–its trade secrets." *Omnitech*, 11 F.3d at 1325.

¶ 41    We find that the facts of this case are more akin to the facts in *Omnitech* than to the facts in *PepsiCo* or *Strata*. Unlike *PepsiCo* and *Strata*, this case does not involve an employee who possessed trade secrets leaving his employer to work for a competitor. Rather, this case involves two companies that had entered into negotiations and shared confidential information. The fact that the information provided by Destiny might have made Cigna more informed in evaluating whether to partner with Destiny or another vendor in the development of an incentive-points program does not support an inference that Cigna misappropriated Destiny's trade secrets absent some showing that Cigna would not have been able to develop its incentive-points program without the use of Destiny's trade secrets.

¶ 42    Absent some evidence that Cigna could not have developed its incentive-points program without the use of Destiny's trade secrets, conclusory assertions of misappropriation based solely upon Cigna's access during the parties' negotiations are not sufficient to make the requisite showing that Cigna's use of those trade secrets was inevitable. See *Rotec Industries, Inc. v. Mitsubishi Corp.*, 179 F. Supp. 2d 885, 895 (C.D. Ill. 2002) (where the plaintiff fails to provide any evidence to substantiate its belief that the defendants used its alleged trade secrets, the plaintiff's argument "is based, not on circumstantial evidence, but solely on unsupported speculation"); *Glenayre Electronics, Ltd. v. Sandahl*, 830 F. Supp. 1149, 1153 (C.D. Ill. 1993) ("Glenayre has not provided any direct evidence of misappropriation, and the circumstantial evidence provided is too thin a reed to withstand Defendants' motion.").

¶ 43    Cigna produced direct evidence that Horgan's team did not rely upon or use any of the confidential information Destiny claims was misappropriated. Destiny has produced no evidence to the contrary. Despite several years of discovery, Destiny has provided no evidence that could support an inference that Cigna used Destiny's information, no evidence that Cigna's incentive-points program is similar to the Vitality program, and no evidence that Cigna could not create its own program without Destiny's information. We decline to assume that Cigna improperly used confidential information based solely on the fact that it had access to the information. Thus, Destiny has not provided sufficient evidence to demonstrate that there is a genuine issue of material fact regarding Cigna's claimed misappropriation.

¶ 44    The foregoing analysis leads us to conclude that the pleadings, depositions, and affidavits of record establish the absence of a genuine issue of fact on the question of Cigna's use of Destiny's trade secrets in the development of Cigna's incentive-points program. As a consequence, Cigna is entitled to judgment as a matter of law on Destiny's claim alleging a violation of the Trade Secrets Act, and we, therefore, affirm the summary judgment entered by the circuit court on that claim.

¶ 45    Next, Destiny argues that the circuit court erred in granting summary judgment in favor of Cigna on its breach of contract claim. In support of its contention in this regard, Destiny relies upon the same arguments that it asserted in urging reversal of the summary judgment entered on its Trade Secrets Act claim. For the reasons stated in our analysis of Destiny's claim brought pursuant to the Trade Secrets Act, we also reject Destiny's arguments that it raised a genuine issue of material fact as to whether Cigna used or misappropriated Destiny's confidential information in breach of the parties' confidentiality agreement and, therefore, affirm the summary judgment in favor of Cigna on the breach of contract claim.

¶ 46    Having determined that there exists no genuine issue of fact on the question of Cigna's misappropriation of Destiny's confidential information, we need not address Cigna's other arguments in support of the summary judgment entered by the circuit court.

¶ 47    Affirmed.